UNITED STATES *v.* AMERICAN EXPRESS Co. *et al.* (No. 1498).[1]

1. COLORED CATGUT.

The coloring here is not a process occurring after the manufacture of the catgut, but pending the manufacture. Whatever the object of the coloring, the articles are manufactured in precisely the same form as the white article, and the colored article is not a manufacture of catgut.

2. CATGUT AND WHIP GUT.

Paragraph 509 of the free list provides for "catgut, whip gut, or worm gut, unmanufactured." The terms "catgut" and "whip gut" are often used interchangeably. Whip gut or whipcord is the result of the process of the manufacture of gut into a twisted article, which clearly falls within paragraph 509.

3. WHIP GUT—TENNIS RACKETS.

The fact that whip gut, the result of such manufacture, is of a length suitable for use in the manufacture of tennis rackets, does not remove it from the free list provision, as the record discloses that this is the length in which whipcord so manufactured is produced in the first instance.

United States Court of Customs Appeals, March 25, 1915.

APPEAL from Board of United States General Appraisers, G. A. 7634 (T. D. 34907).

[Affirmed.]

*Bert Hanson,* Assistant Attorney General, for the United States.
*Comstock & Washburn (Henry J. Rode* of counsel) for appellees.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

The merchandise in question in this case is colored catgut strings in lengths suitable to be used in stringing tennis rackets. It was assessed for duty as manufactures of catgut under paragraph 462 of the tariff act of 1909. On appeal to the Board of General Appraisers it was held to be free of duty under paragraph 509, which reads:

Catgut, whip gut, or worm gut, unmanufactured.

The appraiser in classifying this article for duty evidently roceeded upon the theory that colored catgut should be classified as a manufacture of catgut, although in other respects precisely similar to catgut strings admitted free of duty. The Government, while not abandoning that position before the Board of General Appraisers, claimed that these twisted strings in lengths suitable for use in manu-

---

[1] Reported in T. D. 35275 (28 Treas. Dec., 532).

facturing tennis rackets constituted a manufacture of catgut, and they offered testimony tending to show that in a stage of development of the merchandise here in question there is a form of the gut which is flat and untwisted which is called catgut, and argue from this that the twisted catgut is a manufacture of catgut.

This is not in accordance with common understanding. In the Century Dictionary catgut is defined as—

The intestines of sheep (sometimes of the horse, the ass, or the mule), dried and twisted, used for strings of musical instruments and for other purposes; a string of this kind.

In Spons' Encyclopædia (vol. 1, p. 608) the process of manufacture is described at length, and the description concludes:

In order to produce a cord—known as "whipcord"—from these intestines, they are sewn together by means of the *filandre* before mentioned, the joints being cut aslant to make them smoother and stronger. A number of these cords are then put into wooden frames, whose two uprights are furnished with a series of holes containing pegs for securing the ends of the cords and for passing the lengths around. The spinner attaches the end of one of the cords to the hook of a little whirling apparatus, similar to but smaller than the whirl of the ropemaker, which he causes to rotate rapidly by means of a handle. This puts a twist into the cord and somewhat diminishes its length; the twist is retained by pegging the cord onto the frame. The others are then treated in this way, and when all are completed the frames are piled up horizontally in a small, close chamber lined with thin sheet lead, where they are subjected to the fumes of burning sulphur. This process is called "bleaching," but that is a misnomer, as the alkaline solution has already whitened the gut; the real object of the sulphuring is to prevent the putrefaction of any animal matter which may still be accidentally adhering. The cord may now be dyed black with common ink, or red with red ink, or green, taking the dye readily. The twist being completed, the cords are nicely smoothed and then placed for an hour or so in a hot room—82°–93° (180°–200° F.)—which fixes and consolidates them. Lastly, they are cut off the frames and twisted into cords for sale.

It is also found that the word "whipcord" or "whip gut" is used oftentimes as synonymous with "catgut," as, under the title "whipcord" in the Standard Dictionary—

2. A cord or string made of animal membrane; catgut.

See also Webster's New International Dictionary. But as both terms are included in the free list of the tariff act, it is enough if this article constitutes whip gut.

But the record also discloses this use of the term as applied to the twisted article of commerce. Dr. Kilmer, who produced the exhibit of the flat, untwisted gut, and who stated that it was sometimes called gut and sometimes catgut, was shown illustrative Exhibit C, representing a near approach to surgical catgut, if not indeed that article, was asked under what name it was sold and bought, and answered, "Catgut, surgical gut."

Q. Will you swear it is not surgical catgut?—A. Oh, no; catgut.
Q. That is the name it is asked for, under which it is known?—A. Catgut.

And further on, in answer to a question, referring to the exhibit produced of the flat gut, he was asked:

Q. Then, that is not bought and sold in this condition in the commerce of the United States, excepting by manufacturers; is that so?—A. I could not say; I know we buy it.

Q. You are a manufacturer of surgical supplies, aren't you?—A. Yes, sir.

Q. And you use it to make commercial catgut?—A. Yes, sir.

  *       *       *       *       *       *       *

Q. * * * I want to know whether this illustrative Exhibit D is the material out of which catgut is made, commercial catgut is made?—A. Yes, sir.

This entirely agrees with the holding of the court in Davies, Turner & Co. v. United States (115 Fed., 232), in which it was said of a similar article:

It is admitted that no cruder form of the merchandise than that here in question is imported. The argument based on the history of previous tariff acts throws but little light on the question involved. The opinion of the Board of General Appraisers is based on the testimony of a foreigner—Beisel—called by the Government in another case, and who has never been cross-examined; and, while he said that there was a form of unmanufactured catgut, called "schok," it is admitted that no one ever saw any of this article in this country; and one of the Government officials testifies that he never knew of the importation of any such article. Catgut is prepared from the small intestine of the sheep by a process of cutting, cleaning, and drying. In fact, the intestine of the sheep does not become the catgut of commerce until it has been subjected to this process. Afterwards, when it has gone through an elaborate further process of sterilization, increasing its value from tenfold to one hundredfold, it becomes the manufactured article known as "surgical antiseptic catgut."

The most that can be said is that there is now an article sold by the abattoir direct from the slaughterhouse which is called "gut," and perhaps sometimes called "catgut," but which is not the completed article which has always been known by that name. Much less is it whip gut or whipcord, the process of the preparation of which is described in the quotation from Spons.

It would seem very clear that this article is not therefore distinguishable from the article involved in Davies, Turner & Co. v. United States, *supra*, unless it be because of the fact that it is colored in the process of making. The coloring of the gut is described in Spons above quoted as a portion of the process of manufacture. It is not a process that occurs after the manufacture, but pending the manufacture. The coloring is possibly for the purpose of covering defects in the color, or, for whatever purpose, becomes a part of the process of manufacture, and the colored catgut is manufactured in the same form precisely as the white or uncolored article.

The article is also very clearly distinguishable from that in question in the case of United States v. Sheldon & Co. (5 Ct. Cust. Appls., 421; T. D. 34944). In that case the article in question was seven-sixteenths of an inch in diameter and was composed of a large number of strands of the first-process catgut, twisted in the form of a cable

or rope, and 50 to 100 feet in length, and apparently coated with a light application of some material in the nature of a varnish or oil. It was adapted for use for belting purposes and required no further manufacture for that purpose. It was said—

The testimony of the witness falls far short of showing that the article imported is in its crude form.

In fact, it would have required very strong evidence to show that such an article, when compared with catgut, with which everyone is familiar, was the crude form of catgut. The importer wholly failed in making such showing, and for that reason the article was held to be a manufacture of catgut.

But in the present case this article is most clearly the result of the first manufacture of whip gut or whipcord, which, as pointed out above, are terms synonymous with catgut, and as disclosed by the case of Davies, Turner & Co., *supra*, it is so regarded. It is certainly so treated by lexicographers.

The only question remaining is whether the fact that this cord as produced is in a length which well adapts it to use in stringing tennis rackets constitutes it a manufacture of catgut. It does not appear whether it is manufactured in these lengths in the first instance or whether it is cut to length after being manufactured, and the external appearances fail to indicate which is the fact. The most that can be said is that substantially enough in quantity of the material is present in each separate bundle of the material to make a tennis racket. This, according to the description of the manufacture in Spons, above quoted, might well be the result of the first process of manufacture into whip gut. Indeed, in describing the process of the manufacture of catgut, the witness named David Walker testified as follows:

The gut of the sheep, that part of the intestine of the sheep which is unfit for casing, from 16 or 18 feet of the small gut is taken and first it is slimed; then it is split by pulling it over an apparatus that splits it into two pieces. These pieces are separated, one side being used in the manufacture of musical-instrument strings and the smooth side being used for a manufacture of surgical sutures. Sometimes when there is— sometimes both parts are united and manufactured as described by this piece that I hold. I presume that there is something like 15 or 18 or 20 such strips of gut. It is taken—after it has. been freely slimed and salted and run through several sliming processes and allowed to soak in tepid water, it is then run out on a table that they call the rundown; that is, the ends of 18 or 20 pieces of gut are tied together and combed out by the man's fingers until, we will say, 19 feet. Then they are cut off, taken up, and put in a clutch. The first day it is given 10 turns of a wheel. It is left there for 24 hours and it is again turned until it is twisted down, stretched until it assumes this form here in size. Of course, different irregular lumps, and so on, adhere to it. It is then taken on a stretcher in a dry room and allowed to dry, and boys take pieces of emery and run over it, and where they find a lumpy swelling of the gut, owing to some large proportion of the gut, they take that down and smooth it off, pulling it out into this condition in which you see it here. Then it is gut as this, 19 feet being the length of the tennis gut. That is briefly the process of manufacture.

The length suggested is that of the strings in question.

In providing for the importation of catgut and whip gut free, Congress evidently intended that it should be adapted to some use, and the fact that it is fitted for this special use does not exclude it from the free list, constituting it a manufacture of catgut, any more than a piece of 2 by 4 by 12 or any other piece of dimension lumber is a manufacture of lumber. The case of Cone v. United States (5 Ct. Cust. Appls. 491; T. D. 35149) is clearly distinguishable. There the question presented was whether grasses cut to length and bunched ready for use in the manufacture of an article are dressed within the meaning of the paragraph reading "grasses and fibers, not dressed or manufactured in any manner." The case was determined upon the construction of the word "dressed," and it was found that the grasses in question were dressed ready for use and fell within that term in the statute.

The case of Fischer v. United States (5 Ct. Cust. Appls., 301; T. D. 34477) is cited in support of the Government's contention that these catgut strings are catgut, manufactured. The strings there held to be dutiable as a manufacture of catgut were conceded by the appellant's counsel in their brief to be such, and the court simply followed that concession, so the case is not authority to sustain the Government on a different issue.

The case of Richards v. United States (3 Ct. Cust. Appls., 306; T. D. 32587) presented a case of contest between the two provisions "catgut, whip gut, or worm gut, unmanufactured," and "strings for musical instruments, not otherwise enumerated in this section." It was held in that case that the eo nomine provision for strings for musical instruments should control, and while there is language used in that case which may be construed to support the Government's contention, the real point decided is as stated.

The question here involved was given consideration by the Board of General Appraisers in T. D. 23640, decided in 1904, in which case, following the Davies, Turner & Co. case, the board held that goods such as these, used in the manufacture of tennis rackets, were of the same description as those involved in that case, and treating the red strings the same as those of the natural color, held the articles free of duty. This became the rule of classification until and including the enactment of the law of 1909 and for some years thereafter, and it may well be said that the law of 1909 was enacted with reference to such rule of construction, which was given legislative approval.

The decision of the Board of General Appraisers is *affirmed*.